**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**LEROY GRESHAM,**

**Plaintiff,**

**v.** **Case No. 8:23-cv-1704-MSS-CPT**

**CENTURION, *et al.*,**

**Defendants.**
___________________________________/

# O R D E R

Gresham, a state prisoner, sues Centurion, Nurse Wishon, Nurse Mejias, the director of the prison's medical department, the assistant warden of operations, and the colonel in charge of security for federal civil rights violations. (Doc. 27) An earlier order granted in part and denied in part the Defendants' motion to dismiss the initial complaint. (Doc. 26) Gresham filed an amended complaint. (Doc. 27) The Defendants filed a motion to dismiss the amended complaint (Doc. 28), and Gresham filed a response. (Doc. 31)[1]

[1] Gresham untimely filed the response. He filed a motion for leave to file the untimely response (Docs. 32 and 34), and the Defendants oppose the motion. (Docs. 33 and 35) Because Gresham demonstrates excusable neglect, his motion (Docs. 32 and 34) for leave is **GRANTED**. Fed. R. Civ. P. 6(b)(1)(B).

**FACTS**

In the amended complaint, Gresham alleges that, on August 1, 2019, an inmate stabbed him in the eye several times and that he received treatment at Wauchula Hospital and Tampa General Hospital for his serious injuries. (Doc. 27 at 6) He alleges that a plastic surgeon at Tampa General Hospital determined that surgery was necessary to treat Gresham's serious injuries. (Doc. 27 at 6)

Gresham alleges that the plastic surgeon scheduled an appointment for surgery on August 15, 2019, and informed prison administrators and medical staff that Gresham should remain at the hospital for an extended stay. (Doc. 27 at 7) He alleges that prison administrators and medical staff ignored the surgeon's medical advice and returned Gresham to prison on August 2, 2019. (Doc. 27 at 7)

Gresham alleges that, at the prison, medical staff evaluated him for a couple of hours and returned him to a cell. (Doc. 27 at 7) He alleges that, on August 15, 2019, he did not return to Tampa General Hospital for surgery. (Doc. 27 at 7) He alleges that the assistant warden of operations and the colonel in charge of security did not want to expend resources to transport him back to Tampa General Hospital. (Doc. 27 at 7)

Gresham alleges that he submitted a sick call request to the prison's medical staff to advise them about the missed appointment. (Doc. 27 at 8–9) He alleges that a nurse reviewed his file, acknowledged the missed appointment, and promised to inform other persons about the appointment. (Doc. 27 at 9) He alleges that, several weeks later, he was transferred to the prison's medical center in Lake Butler, Florida, and a doctor advised that "it was too late to send him back to Tampa General

Hospital" because "it would be too dangerous." (Doc. 27 at 9) He alleges that his eyesight in the injured eye worsened over time until he lost his vision and that his face is permanently disfigured. (Doc. 27 at 9, 11)

Gresham alleges that the assistant warden of operations, the colonel in charge of security, and the director of the prison's medical department knew about the appointment for surgery and intentionally prevented him from attending the appointment. (Doc. 27 at 8–9) Also, Gresham alleges that Nurse Wishon and Nurse Mejias knew about the appointment and intentionally prevented him from attending the appointment. (Doc. 27 at 9–10)

Gresham attached to his amended complaint a medical report by a doctor dated August 1, 2019, that states that inpatient admission of Gresham to the hospital was a "medical necessity" and that Gresham should remain in the hospital "for greater than two midnights, inclusive of time in the [emergency room]" because of "[p]atient risk factors and necessary services includ[ing] left orbital fracture." (Doc. 27 at 20) He attached a medical report from Tampa General Hospital by the doctor dated August 2, 2019, that states: "Decision made to proceed with operative repair in two weeks, once edema has settled. Will schedule. Stable for [discharge]." (Doc. 27 at 23) A stamp with Nurse Wishon's name and her signature appear on the documents. (Doc. 27 at 20, 23)

Also, Gresham attached to his complaint medical records from the prison. (Doc. 27 at 25–27) A note by Nurse Mejias dated August 2, 2019, states that Gresham returned from Tampa General Hospital with "under eye sutures," and received

medication, and that Gresham had a follow-up appointment on August 15, 2019, with Dr. Harrington. (Doc. 27 at 25) Another note by Nurse Wishon dated August 2, 2019, states that Gresham received treatment at Tampa General Hospital for an "acute trauma [and] injury to left orbit and left eye," and that Gresham returned from the hospital and received medication. (Doc. 27 at 26) Nurse Wishon stated that Gresham was "referred to [a] reconstructive surgeon [in the] next two weeks by [a] [Tampa General Hospital] physician." (Doc. 27 at 26) Nurse Wishon provided a description of the injuries to Gresham's eye and stated that medical staff at the prison "will refer [Gresham] to [a] reconstructive surgeon as recommended." (Doc. 27 at 26–27)

Gresham alleges that the prison contracts with Centurion to provide medical care and that Centurion adopted a policy and custom of providing inmates with deficient medical care to save money. (Doc. 27 at 10–12) He alleges that a nurse at the prison told him that Centurion strives to make as much money as possible by spending as little money as possible. (Doc. 27 at 10) He alleges that, under Centurion's policy, medical staff at the prison minimizes a prisoner's medical needs, provides sub-standard and deficient medical care, and ignores the need for care by outside healthcare providers. (Doc. 27 at 10)

Gresham attached to his amended complaint a magazine article that states that, on October 5, 2020, Centurion withdrew from a contract to provide medical care to prisons in Mississippi. (Doc. 27 at 29) The article states that, on behalf of 227 prisoners, attorneys sued the Mississippi Department of Corrections and Centurion. (Doc. 27 at 29) The article states that the suit followed the deaths of seven prisoners during

widespread riots in early 2020 at many prisons in Mississippi. (Doc. 27 at 29) In a letter withdrawing from the contract, Centurion stated that the company could not improve the effectiveness of medical care without additional investment in correctional staffing and infrastructure by the prison. (Doc. 27 at 29) The author of the article opined that "[i]t seem[ed] ironic that a for-profit company that has been named in hundreds of lawsuits for alleged deliberate indifference to prisoners' healthcare needs would drop a contract." (Doc. 27 at 29)

Gresham asserts that the Defendants acted deliberately indifferent to his serious medical need and that Centurion's policy caused him to receive deliberately indifferent medical care at the prison. (Doc. 27 at 8–12) He demands compensatory and punitive damages. (Doc. 27 at 6)

**STANDARD OF REVIEW**

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. When ruling on a motion to dismiss, a court must accept the allegations in the complaint as true and construe the allegations in the light most favorable to the plaintiff. *Luke v. Gulley*, 975 F.3d 1140, 1143 (11th Cir. 2020). Allegations in a *pro se* pleading are reviewed liberally. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972).

"'In deciding whether a complaint states a claim upon which relief may be granted, [courts] normally consider all documents that are attached to the complaint

or incorporated into it by reference.'" *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1303 (11th Cir. 2022) (citation omitted). *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "When a document considered at the motion to dismiss stage contains 'ambiguities . . . subject to interpretation,' courts should interpret all ambiguities in the plaintiff's favor." *Edwards v. Dothan City Schs.*, 82 F.4th 1306, 1311 (11th Cir. 2023) (citation omitted).

## ANALYSIS

### Centurion

Centurion asserts that the amended complaint fails to allege facts that demonstrate that a policy or custom by Centurion caused Gresham to receive constitutionally deficient medical care. (Doc. 28 at 8–9)

In the order granting in part and denying in part the Defendants' first motion to dismiss, the Court dismissed a claim against Centurion in the initial complaint as follows (Doc. 26 at 6–7):

> Because the Florida Department of Corrections contracts with Centurion to provide medical care to inmates, Centurion "performs a function traditionally within the exclusive prerogative of the state" and becomes the "functional equivalent" of the state. *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997). Gresham must allege that a policy or custom by Centurion was the moving force behind the constitutional violation. *Craig v. Floyd Cty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

Gresham alleges that (Doc. 1 at 10): "Centurion took on an unofficial custom [and] policy to save as much money as possible by way of providing inadequate medical care for serious medical needs of [Florida Department of Correction] inmates and would have its prison medical employees provide [and] perform little to no medical treatment." He alleges that a nurse at the prison told him that Centurion strives to make as much money as possible by spending as little money as possible. (Doc. 1 at 10)

"A policy is a decision that is officially adopted by the [governmental entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489.

To establish a custom, "'it is generally necessary to show a persistent and wide-spread practice.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) (quoting *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)). "'[A]ctual or constructive knowledge of such customs must be attributed to the governing body of the [governmental entity].'" *Church*, 30 F.3d at 1345 (quoting *Depew*, 787 F.2d at 1499). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability against a [governmental entity]. A pattern of similar constitutional violations . . . is ordinarily necessary." *Craig*, 643 F.3d at 1310 (citations and internal quotations omitted).

While allegations in the complaint are accepted as true when reviewing a motion to dismiss, a plaintiff must support legal conclusions with factual allegations. *Iqbal*, 556 U.S. at 679. Because Gresham fails to identify any other inmate to whom Centurion provided constitutionally deficient medical care and fails to allege that policymakers at Centurion actually or constructively knew about "a persistent and wide-spread practice" of providing constitutionally deficient care, he fails to state a claim against Centurion. *Church*, 30 F.3d at 1345.

In the amended complaint, Gresham also fails to identify any other inmate to whom Centurion provided constitutionally deficient medical care. (Doc. 27 at 10–12)

Gresham instead contends that a statement by a nurse at the prison demonstrates a policy by Centurion. He alleges that the nurse, whom he fails to identify by name, informed him that "Centurion had two goals[:] (1) to make as much money as possible by (2) spending as little money as possible." (Doc. 27 at 10) Even viewed in the light most favorable to Gresham, this allegation does not demonstrate that Centurion adopted an official policy. The statement about Centurion's "two goals" at most describes a custom. Because the allegation about the nurse's conclusory statement does not, by itself, demonstrate a persistent and wide-spread practice by Centurion, the allegation fails to support a claim against Centurion. *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994).

Gresham further contends that a magazine article demonstrates a policy by Centurion of prioritizing profit over medical care. (Doc. 27 at 29) The article states that, on July 27, 2020, Centurion withdrew from a contract with the Mississippi Department of Corrections after 227 prisoners filed a lawsuit against Centurion and the prison. (Doc. 27 at 29) The article states that the Mississippi prisoners initiated the lawsuit after the deaths of seven prisoners during riots in prisons located all over Mississippi. (Doc. 27 at 29) The article states that Centurion withdrew from the contract after blaming the prison for not providing sufficient funding for "correctional staffing and infrastructure." (Doc. 27 at 29)

Even viewed in the light most favorable to Gresham, the article fails to demonstrate a claim against Centurion. The article does not state that Centurion adopted an official policy of providing deficient medical care in prisons in Mississippi. (Doc. 27 at 29) The article does not state that the riots arose because of deficient medical care in the prisons. (Doc. 27 at 29) The article instead states that Centurion withdrew from a contract to provide medical care because prisons in Mississippi failed to invest in staffing and infrastructure. (Doc. 27 at 29) The article states that an expert who evaluated a prison in Mississippi discovered dangerous hazards, including "exposed wiring" near standing water, and described general conditions as "subhuman and deplorable in a civilized society." (Doc. 27 at 29) The article does not sufficiently describe a persistent and widespread practice by Centurion of providing deficient medical care.

Even if the article demonstrates that Centurion had a persistent and widespread practice of providing deficient medical care to prisoners in Mississippi, the Court cannot infer that Centurion implemented the same unlawful practice in Florida. *Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'") (quoting Fed. R. Civ. P. 8(a)(2)).

Because Gresham fails to identify any other Florida inmate to whom Centurion provided constitutionally deficient medical care and fails to allege that policymakers at Centurion in Florida actually or constructively knew about "a persistent and wide-

spread practice" of providing constitutionally deficient care in Florida, he fails to state a claim against Centurion. *Church*, 30 F.3d at 1345.

**Nurse Wishon and Nurse Mejias**

The Defendants assert that Gresham fails to state a claim against Nurse Wishon and Nurse Mejias. (Doc. 28 at 9–13) The Defendants contend that the complaint fails to allege facts that demonstrate that Nurse Wishon and Nurse Mejias deliberately prevented Gresham from attending his hospital appointment on August 15, 2019. (Doc. 28 at 11–12)

In the earlier order, the Court denied the motion to dismiss the claims against Nurse Wishon and Nurse Mejias as follows (Doc. 26 at 8–11):

> To state a claim for deliberate indifference, a plaintiff must allege "(1) that he had a serious medical need; (2) that [the defendant] exhibited deliberate indifference to that need; and (3) that [the defendant's] deliberate indifference caused [the plaintiff's] injury." *Christmas v. Nabors*, 76 F.4th 1320, 1335 (11th Cir. 2023). Also, the plaintiff must demonstrate that "the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff," and that the defendant failed to reasonably respond to the risk. *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). "[The] plaintiff must show that the defendant official was subjectively aware that his own conduct — [ ] his own actions or inactions — put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1258.
>
> Gresham alleges that Nurse Wishon and Nurse Mejias knew about his hospital appointment on August 15, 2019, because their names appear on medical records from prison, and that Nurse Wishon and Nurse Mejias intentionally ignored the appointment. (Doc. 1 at 9–10)
>
> <u>Nurse Mejias</u>

A handwritten note in medical records from prison, dated August 2, 2019, at 1:45 P.M., and signed by Nurse Mejias states (Doc. 1-1 at 8):

> Inmate received from Tampa General Hospital with under eye sutures, alert and oriented. Blood pressure — 137/81. Temperature — 98.8. SpO2 — 98%. Weight — 158 pounds. Pulse — 70 bpm. Respiration rate — 16. Inmate received a prescription of erythromycin ophthalmic ointment and hydrocodone — acetaminophen PO. Inmate received a follow-up appointment on August 15, 2019, with MD Michael Harrington. Referred to POD — N. Mejias, RN, Hardee CI.

Additional notes appeared above the handwritten note by Nurse Mejias. (Doc. 1-1 at 8) On August 1, 2019, at 5:20 P.M., another nurse wrote that she received a report from Advent Health in Wauchula, Florida, that the hospital transferred Gresham to Tampa General Hospital because Gresham suffered a "stabbing [that] penetrat[ed] his eye socket." (Doc. 1-1 at 8) On August 2, 2019, at 11:00 A.M., another nurse wrote the following note concerning Gresham's high blood pressure medication (Doc. 1-1 at 8):

> Pharmacy tech from Tampa General Hospital call[ed] to update on high blood pressure medication. Inmate['s] use information given. Pharmacy tech inform[ed] that the inmate is pending a doctor's evaluation. Inmate [is] stable. Will [tell] the nurse to call. Tried to call three times, no answers.

Handwritten notes by other nurses about Gresham's condition and the need for treatment appear after Nurse Mejias's handwritten note. (Doc. 1-1 at 8–10)

Viewed in the light most favorable to Gresham, the handwritten note by Nurse Mejia demonstrates that Nurse Mejia knew that Gresham suffered a stab wound to his eye,

was transported to Tampa General Hospital for treatment, and returned in stable condition to the prison with prescription medication. Also, the handwritten note demonstrates that Nurse Mejia knew that Gresham had a follow-up appointment on August 15, 2019. Because, at this early stage in the case, the Court can reasonably infer from these documents and the allegations in the complaint that Nurse Mejia acted deliberately indifferent to Gresham's serious eye injury by failing to ensure that he went to the follow-up appointment with Dr. Harrington on August 15, 2019, to receive additional treatment, Gresham states a facially sufficient claim against Nurse Mejia. *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Lane v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016) ("'[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Inferences from circumstantial evidence, however, can be used to show that a prison official possessed the necessary knowledge.").

<u>Nurse Wishon</u>

A handwritten note in medical records from prison, dated August 2, 2019, at 3:00 P.M., and signed by Nurse Wishon states (Doc. 1-1 at 9–10):

> Patient seen for outside hospital return. Patient was seen and treated at Advent Health Wauchula, and then transferred to Tampa General Hospital. Patient [suffered] acute trauma/injury to left orbit and left eye. CT from Advent Health revealed a comminuted fracture involving inferolateral aspect of left orbit with fracture fragments extending to level of skin. There is also a displaced fracture involving left orbital floor with extraconal fat extending into left maxillary antrum (see complete report findings). Patient prescribed e-mycin ophthalmic ointment and pain medication. Patient referred to reconstructive

> surgeon [in] next two weeks by Tampa General Hospital physician.
>
> Patient reports as stable. Pain on left face and under left eye is seven or eight out of ten. Denies any dizziness, changes in vision in right eye, N/V, syncope, chest pain, shortness of breath, palpitations, intense headaches.
>
> Observations — [ ] stable, hydrated, at OX 3, movement and gait normal. Head: left peri-orbital and maxillary swelling. One to one and one-half healing. Laceration left face; well-approximated. Left eye swollen shut. Left conjunctiva largely injected and irritated. Right eye pupil round and reacts to light. Neck supple; and JVD. Heart RRR. Lungs CTA. Abdomen soft, non-tender. And B.S. x 4 Quad.
>
> A — S/P acute trauma face. Left orbital floor fracture. P/E and P.O.C. and treatment discussed. Will prescribe pain medication and antibiotic ointment as recommended. Will refer to reconstructive surgeon as recommended. Will admit to infirmary 23 degrees observation, including neurochecks and V.S. Patient to follow up with POD three to five days, or PPW per protocol.

Also, a stamp with Nurse Wishon's name and her signature appear on medical records from Tampa General Hospital. (Doc. 1-1 at 2–4, 6) Those documents state that Gresham had a follow-up appointment with Dr. Harrington for "operative repair" of an "orbital floor fracture" on August 15, 2019. (Doc. 1-1 at 2–3, 6)

The medical records demonstrate that Nurse Wishon examined Gresham when he returned from the hospital, knew that he suffered a serious injury to his left eye, prescribed Gresham medication for the serious injury, and knew that Gresham had an appointment on August 15, 2019, with a surgeon to treat the serious injury.

> Gresham alleges that the prison never transported him to the appointment on August 15, 2019, and that Nurse Wishon knew about the appointment but intentionally ignored the appointment. (Doc. 1 at 9) Because both the documents and the allegations in the complaint support a reasonable inference that Nurse Wishon knew about Gresham's appointment on August 15, 2019, with the surgeon to treat the serious injury, and failed to ensure that Gresham went to the appointment, Gresham states a facially sufficient deliberate indifference claim against Nurse Wishon. *Iqbal*, 556 U.S. at 678.

Defendants do not present any argument that justifies reconsideration of the Court's earlier ruling. Gresham attaches the same medical records to his amended complaint. (Doc. 27 at 20, 23, 25–27) Viewed in the light most favorable to Gresham, the allegations in the amended complaint, supported by the medical records, demonstrate a deliberate indifference claim against both Nurse Wishon and Nurse Mejias.

Accordingly, the Defendants' motion (Doc. 28) to dismiss is **GRANTED** in part without prejudice and **DENIED** in part. Gresham shall have **30 DAYS** to seek leave once more to plead a claim against Centurion. If he fails to do so or chooses not to do so, the claim will be dismissed with prejudice.

This case will proceed with the remaining claims in Gresham's amended complaint. No later than **NOVEMBER 11, 2026**, the parties must complete discovery. No later than **45 DAYS** after completion of discovery, a party may file a motion for summary judgment.

The Clerk is **DIRECTED** to **STAY** and **ADMINISTRATIVELY CLOSE** this case until the parties complete discovery. After the parties complete discovery, the Defendants must file a motion to lift the stay and re-open the case. If any party must seek relief while engaging in discovery, a party may file an appropriate motion. If Gresham decides to amend the complaint to cure the defects in the allegations against Centurion, the Clerk is **DIRECTED** to docket that Amended Complaint.

**DONE AND ORDERED** in Tampa, Florida on March 2, 2026.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE